

**FILED**

Jan 21 2020, 8:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

William E. Kelley, Jr.
Marc A.W. Stearns
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Michael J. Jasaitis
Ryan A. Deutmeyer
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Aquatherm GmbH,

*Appellant-Defendant,*

v.

Renaissance Associates I
Limited Partnership,

*Appellee-Plaintiff.*

January 21, 2020

Court of Appeals Case No.
19A-PL-981

Appeal from the
Lake Superior Court

The Honorable
John M. Sedia, Judge

Trial Court Cause No.
45D01-1709-PL-98

**Altice, Judge.**

## Case Summary

[1] This is an interlocutory appeal addressing the question of personal jurisdiction over Aquatherm GmbH (GmbH), a German company that manufactures polypropylene water pipes. Its pipes were installed in two ten-story apartment buildings called Renaissance Towers (the Towers) located in Hammond, Indiana and owned by Renaissance Associates I Limited Partnership

(Renaissance). After experiencing problems with the pipes, Renaissance filed a lawsuit against multiple entities, including GmbH. GmbH filed a motion to dismiss for lack of personal jurisdiction, which the trial court denied. GmbH now appeals, asserting that neither general personal jurisdiction nor specific personal jurisdiction exists.

We affirm.

## Facts & Procedural History

GmbH's principal place of business is in Attendorn, Germany, and it manufactures the Aquatherm pipe only in Germany. GmbH does not own or lease any offices or any other real property in Indiana and is not registered to do business in Indiana. GmbH does not have a warehouse anywhere in the United States.

In addition to GmbH, there are several other Aquatherm entities involved in this lawsuit, including: Aquatherm, Inc., Aquatherm NA, L.C. (Aquatherm NA), and Aquatherm, L.P. (Aquatherm, LP). Initially, GmbH sold all of its Aquatherm pipe used for projects in the United States to Aquatherm, Inc. In January 2011, Aquatherm Inc. became known as Aquatherm NA, and from January 2011 to December 2015, GmbH sold its pipe used for projects in the United States to Aquatherm NA. Pursuant to a December 1, 2015 asset purchase agreement, Aquatherm NA's assets were sold to Aquatherm, LP., and GmbH sold all Aquatherm pipe used for projects in the United States to Aquatherm, LP. When Aquatherm NA ceased operations, it had three

warehouses, which were in Lindon, Utah, Virginia, and Toronto, Canada. Aquatherm, LP has one warehouse, and it is in Lindon, Utah.

[5] The Aquatherm pipe at issue was delivered by GmbH under either or both of the following two delivery methods: (1) "FOB any European port" or (2) "Cost Insurance Freight." *Appellant's Brief* at 10-11. Under FOB any European port, title to the pipe transferred from GmbH to Aquatherm NA upon the pipe's arrival at a European port. Aquatherm NA sold the Aquatherm Pipe to approved distributors, including Columbia Pipe & Supply. Co. (Columbia Pipe), a defendant in this action. When the Aquatherm pipe was shipped from an Aquatherm NA warehouse to a distributor, title to the product transferred from Aquatherm NA to the distributor upon shipment. *Appellant's Appendix Vol. II* at 105. Under Cost of Insurance Freight delivery method, GmbH delivered pipe to Aquatherm, LP's Lindon, Utah warehouse where it was held "as consignment stock" and title transferred from GmbH to Aquatherm, LP when Aquatherm, LP took the product out of stock at the Utah warehouse. *Appellant's Brief* at 10-11. Aquatherm, LP sold Aquatherm pipe to distributors "under [the] same conditions" as Aquatherm NA sold to distributors. *Id*. at 12.

[6] In 2012, Renaissance began a construction project to replace the galvanized steel hot water supply lines in the Towers. After meetings and discussions with personnel from Aquatherm entities and contractor Circle R Mechanical, Inc. (Circle R), Renaissance chose GmbH's polypropylene pipes for the Tower project. Renaissance entered into written contracts with Circle R, in which Circle R agreed to provide all necessary labor and materials, including boilers

and pipe, for the Towers project. Circle R purchased the pipe from Columbia Pipe, which held a distributor agreement with Aquatherm NA. Columbia Pipe also was the "authorized Aquatherm trainer" that trained Circle R employees regarding installation of the pipe. *Appellant's Appendix Vol. II* at 61. The project began in 2012 and was completed in March 2013, with over 5000 linear feet of GmbH's pipe having been installed in the Towers.

[7] According to Renaissance, it began experiencing ruptures, failures, and extensive leaking with the hot water piping system at the Towers in 2014. The problems continued, and, on August 31, 2017, Renaissance filed its Complaint against defendants Circle R, Columbia Pipe, and Aquatherm, LP[1], asserting claims pertaining to alleged issues with the installation and performance of the hot water piping system at the Towers, including breach of contract, various breaches of warranty, negligence, and negligent misrepresentation. On or about February 27, 2018, Renaissance filed its First Amended Complaint asserting similar and additional claims against those defendants and adding defendants Aquatherm NA, Aetna NA, L.C., Aquatherm, Inc., Clark Family Holdings, L.C., and GmbH.[2] As to jurisdiction, the First Amended Complaint stated:

---

[1] According to the Complaint, Renaissance is a limited partnership created under the laws of Missouri; Circle R is an Indiana corporation with its principal office in Portage, Indiana; Columbia Pipe is an Illinois corporation with its principal office in Chicago; and Aquatherm, LP is a Delaware limited partnership with its principal office in Lindon, Utah. Circle R and Columbia Pipe maintain offices in Indiana.

[2] As is relevant to this appeal, Aquatherm NA is a Utah limited liability company with its principal place of business in Lindon, Utah, and GmbH is a foreign corporation organized in Germany with its principal office in Attendorn, Germany. Aquatherm, Inc. was a dissolved Utah corporation at the time the First Amended Complaint was filed.

13. This Court has personal jurisdiction over Defendants Aquatherm LP, Aquatherm NA, Aetna NA, Aquatherm, INC and CF Holdings (collectively: "Aquatherm") under long arm jurisdiction for actions targeted to and occurring in Indiana because Aquatherm, including relevant predecessors and/or successors regularly conducts business in Indiana with respect to the marketing, sales and supplying of Aquatherm pipes that are the focus of the underlying dispute in this matter. Aquatherm representatives also traveled to Indiana to consult and/or advise with respect to the Aquatherm pipes at the Towers.

14. This Court has personal jurisdiction over Defendant Aquatherm GmbH under long arm jurisdiction for actions targeted to and occurring in Indiana because this entity regularly conducts business in Indiana with respect to the manufacture, marketing, sales and/or supplying of Aquatherm pipes that are the focus of the underlying dispute in this matter.

*Id.* at 60. The Amended Complaint stated that "Aquatherm claims to back its products with a 10-year manufacturer's warranty that covers replacement parts, replacement labor, incidental damages, medical costs, and financial loss."[3] *Id.* at 61. The only count against GmbH alleged negligence arising out of alleged defective design and manufacture of the pipes and failure to warn and/or instruct Renaissance about the defects and the proper and/or safe use of the pipes. Renaissance alleged that it was damaged in an amount of at least $413,300 as a proximate result of GmbH's negligence.

---

[3] Both Complaints also alleged that, pursuant to the contracts, Circle R was to obtain professional liability insurance and keep it in effect for three years after completion of the work and that Circle R "never obtained such professional liability insurance[.]" *Appellant's Appendix Vol. II* at 25, 61.

[8] On October 24, 2018, GmbH filed a Motion to Dismiss for Lack of Personal Jurisdiction, arguing that GmbH lacked sufficient minimum contacts with Indiana such that the exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment. It maintained that GmbH's "involvement with the [] piping transaction was completed upon the pipe's delivery to Aquatherm NA's or Columbia Pipe's storage or warehouse locations," that the distributors handled the redelivery to project sites, and "GmbH had no direct involvement with the [] Towers project." *Id*. at 83. GmbH argued that general personal jurisdiction did not exist as it did not have continuous and systematic contacts with Indiana, nor did specific personal jurisdiction exist because "GmbH did nothing more than place its product into the stream of commerce, which is not enough for it to be haled into this Court." *Id*. at 94. In support of its motion to dismiss, GmbH attached the affidavits of (1) Dirk Rosenberg, a Director of GmbH, and (2) Jordan Handy, CEO of Aquatherm L.P. (and formerly CFO of Aquatherm, Inc. and Aquatherm NA).

[9] Rosenberg's affidavit averred that GmbH does not own or lease property in Indiana, "does not have any sales or marketing representatives or distribution networks in Indiana[,]" "does not market Aquatherm pipe in [] Indiana[,]" "had no involvement with the [Towers] project[,]" and had "no knowledge that some of Aquatherm's pipe . . . would eventually be redelivered to Indiana . . . and used for the [Towers] project[.]" *Id*. at 98, 100. Hardy's affidavit stated, among other things, that GmbH did not have any involvement after the

distributor took title to the pipe and that GmbH did not track the destination of the pipe.

[10] Renaissance filed its opposition to the motion for summary judgment, asserting that Indiana has both general and specific personal jurisdiction over GmbH. Renaissance argued that GmbH "has purposefully availed itself of conducting business in Indiana" through its "substantial national distribution network in the United States." *Id.* at 109, 111. Renaissance argued that GmbH did not merely place its product in the stream of commerce; it knew and in fact encouraged that its product would be sold in the United States, including in Indiana, and that GmbH's activities made it reasonable that it would anticipate being haled into court in Indiana.

[11] In support of its opposition, Renaissance submitted the affidavit of Daniel Medve, Secretary for Renaissance. Medve attached to his affidavit Exhibits A through S, which consist of printed pages from Aquatherm websites, including pages from GmbH and Aquatherm, LP's respective sites, answers to discovery requests, and warranty documentation. GmbH's website (www.aquatherm.de) includes a link, represented by a United States flag, for United States customers to click. Medve explained that when a user clicks the flag, a pop-up window appears which states, "Aquatherm LP is the exclusive sales representative of acquatherm GmbH for the USA and Canada" and, to proceed, the interested user is to click "Enter site" link. *Id.* at 126, 134. Once a user clicks "Enter site," he/she enters the www.aquatherm.com website, which welcomes users to Aquatherm and, among other things, provides tabs for one to "Read about

Aquatherm", "See Aquatherm in action", "Learn about Aquatherm", "Install Aquatherm systems," and "Design with Aquatherm." *Id.* at 136.

[12] The various attached web pages discuss Aquatherm companies including GmbH, noting that GmbH "placed first" in a German research study that collected data and assessed promising and innovative companies, was established in 1973, and "Today Aquatherm employs more than 450 employees at its four main locations." *Id.* at 141. When describing "Our Organization" for users, one webpage states, "Aquatherm began its major launch into the United States" in 2007 and, as of 2013, it had seventeen companies serving as manufacturer's representatives in the United States and "distribution in every state." *Id.* at 173. Another page has a map of Indiana counties and states "This area has multiple sales and support reps." *Id.* at 165. The website pictures many "current projects" around the globe, with a picture and location for each, including one in Indianapolis, the Lifeline Data Center. *Id.* at 144, 152. The Lifeline Data Center project is featured elsewhere on the site, with a testimonial from Lifeline's owner and describing the Lifeline project as being multi-phase between the years 2009 and 2013. For further information on matters viewed on the website, a user is directed to call a phone number "or simply visit our download area at our website www.aquatherm.de." *Id.* at 163.

[13] Upon clicking the "Learn about Aquatherm" tab, the website states:

> We here at Aquatherm aren't content with simply telling people
> how great our products are. We show it by providing an
> extensive ten-year warranty that covers any parts, labor, personal

injury, and incidental damages caused by material failure due to manufacturer defect. The warranty covers the pipes, fittings, and damages up to €20 million per event.

In order to take advantage of the warranty, the system must be installed by an Aquatherm-trained installer and subjected to pressure testing. The pressure test will stress the system and help identify any weak points due to improper fusions or other reasons.

*Id*. at 176.

[14] Medve's affidavit averred that the ten-year warranty "is issued by Aquatherm GmbH through Aquatherm." *Id*. at 129. In support, he attached a "Warranty Receipt", which was produced in discovery by Aquatherm, LP to Renaissance, dated February 8, 2013 on "aquatherm" letterhead. The Warranty Receipt reflected that "Aquatherm GmbH provides a 10-year warranty on its products with business liability insurance and extended product liability insurance through ZURICH" and states that warranty claims "are valid only under the following conditions":

1. Only welding tools and devices approved by Aquatherm GmbH may be used in installation.

2. Installers must be certified as having received training from Aquatherm. Installers must adhere to Aquatherm GmbH technical rules and guidelines for correct installation.

3. Upon completion of a project, a record of a successful pressure test must be submitted to Aquatherm.

*Id*. at 216. The attached confirmation of coverage documentation from Zurich stated that "risks insured" included "Exports; also to the USA and Canada." *Id*. at 217. Medve averred in his affidavit that the warranty "was a determinative factor in choosing [] GmbH pipes for the [] Towers project." *Id*. at 128.

[15] An online "Explanatory Comments on the Aquatherm GmbH Warranty" document, which Medve attached to his affidavit, stated "Thank you very much for making the decision to use a product from aquatherm GmbH, Germany (herein referred to as 'aquatherm')" and thereafter provided information about, *inter alia*, the scope of the warranty, what is covered and not covered, how compensation is determined, and required manner of making a claim. *Id*. at 219. As to "how [] the amount of compensation under the aquatherm warranty [is] determined," it stated, "Working in collaboration with aquatherm GmbH and the insured party, aquatherm will identify the cause of the damage[.]" *Id*. The document directed that "[w]arranty claims have to be made to aquatherm via the national aquatherm GmbH partners." *Id*. at 220. The Explanatory Comments document reflected it was prepared by GmbH in April 2016.

[16] A portion of an Installers Manual, which was attached to Medve's affidavit and also provided during discovery, listed immediately next to each other the respective names, addresses, and websites of GmbH and Aquatherm L.P. companies. Renaissance asserted that this, and the other website evidence,

illustrated the two companies were related in terms of manufacture, distribution, installation, and warranty of the GmbH pipes.

[17] The trial court held a hearing on GmbH's motion to dismiss on February 7, 2019. GmbH argued that once the distributors took the pipe, they, not GmbH, had "title, ownership, responsibility, risk of loss, everything on the pipe from that point forward[.]" *Transcript* at 9. GmbH maintained that, under case law, just having GmbH pipe end up in Indiana through the stream of commerce did not give Indiana personal jurisdiction, general or specific, over it. As to website and online presence, GmbH argued that its website and marketing was part of a passive nationwide advertising plan, consisting of general information, and did not involve interaction between consumer and the company, and under those circumstances, did not support personal jurisdiction. As to its warranty, GmbH asserted that having a warranty did not reflect that GmbH had actively placed itself in Indiana to create sufficient minimum contacts to confer personal jurisdiction.

[18] Renaissance responded with argument that while any of those factors individually might not support personal jurisdiction, GmbH had engaged in an "active coordinated effort" that was sufficient to support a finding of personal jurisdiction. *Id*. at 20. Counsel urged, "[I]t's that warranty in combination with, not alone, but in combination with an active marketing scheme to penetrate the whole [] country." *Id*. at 23. Renaissance contended that GmbH manufactured a product that it intended to be used in the United States, including Indiana, and it marketed and warranted those products. Renaissance

highlighted that the GmbH website marketed the fact that one or more projects were installed in Indiana and that it had sales representatives in Indiana.

[19] On February 8, 2019, the trial court issued an order denying GmbH's motion to dismiss. The court recognized Indiana Trial Rule 4.4(A) as the starting point for determining personal jurisdiction and that this state may only exercise jurisdiction if it is not inconsistent with the Indiana and United States Constitutions, including the Fourteenth Amendment pursuant to which the defendant must "have certain minimum contacts with the state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice, *LinkAmerica* [*Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind 2006)]; *Boyer* [*v. Smith*, 42 N.E.3d 505, 509 (Ind. 2015)]." *Appellant's Appendix Vol. II* at 20. The trial court determined that although GmbH's "coordinated, systematic, marketing plan" might alone not be enough of a minimum contact "to avoid offending traditional notions of fair play and substantial justice," that marketing plan, combined with GmbH's ten-year manufacturer's warranty issued to Renaissance put GmbH "on notice that a breach of warranty" "might make it liable in our courts." *Id.* At GmbH's request, the trial court certified its order for interlocutory appeal,[4] over Renaissance's objection, and we accepted jurisdiction.

---

[4] The trial court stayed all trial proceedings as to GmbH only.

# Discussion and Decision

## I. Standard of Review

[20]   GmbH asserts that the trial court should have granted its motion to dismiss based on lack of personal jurisdiction.  Personal jurisdiction refers to a court's power to impose judgment on a particular defendant.  *Boyer*, 42 N.E.3d at 509.  Because Indiana courts are courts of general jurisdiction, jurisdiction is presumed.  *Everdry Mktg. and Mgmt., Inc. v. Carter*, 885 N.E.2d 6, 10 (Ind. Ct. App. 2008).  A challenge to personal jurisdiction may be raised either as an affirmative defense or in a motion to dismiss.  *See Boyer*, 42 N.E.3d at 508 n.1.  "When a defendant challenges the existence of personal jurisdiction, the plaintiff must present evidence of the court's personal jurisdiction over the defendant."  *Wolf's Marine, Inc. v. Brar*, 3 N.E.3d 12, 15 (Ind. Ct. App. 2014).  "The defendant, however, bears the ultimate burden of proving lack of personal jurisdiction by a preponderance of the evidence, unless such lack is apparent on the face of the complaint."[5]   *Id*.

---

[5] GmbH states that "there appears to be a split in authority among Indiana cases" with regard to which party has the burden of proof as to jurisdiction.  *Appellant's Brief* at 15.  GmbH's suggestion in that regard is based on the fact that our Supreme Court in *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006), stated that personal jurisdiction must comport with the federal due process clause.  GmbH suggests that this was effectively a directive that Indiana courts should follow the federal analysis – where "the plaintiff . . . bears the burden of establishing personal jurisdiction."  *Appellant's Brief* at 15.  We do not find that *LinkAmerica*'s statement was an instruction to follow the federal analysis, nor do we discern a split among Indiana courts concerning the burden of proof.

We review a trial court's decision regarding personal jurisdiction de novo. *Boyer*, 42 N.E.3d at 508. We do not defer to the trial court's legal conclusion as to whether personal jurisdiction exists. *Everdry*, 885 N.E.2d at 10. However, whether personal jurisdiction exists can depend upon factual determinations concerning a defendant's contacts with the forum state, and when the trial court issues findings of jurisdictional facts, we review those findings for clear error. *Boyer*, 42 N.E.3d at 509. In so doing, we consider whether the evidence supports the findings and whether the findings support the judgment. *Id.* We will reverse the trial court's factual findings only when the record contains no facts to support them either directly or indirectly. *Id.* (citing *Fischer v. Heymann*, 12 N.E.3d 867, 870 (Ind. 2014)).

## II. Personal Jurisdiction

Indiana Trial Rule 4.4(A) is Indiana's equivalent of a "long-arm statute." It enumerates eight specific acts that may serve as a basis for an Indiana trial court's assertion of personal jurisdiction over a nonresident and further provides that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." Our Supreme Court in *LinkAmerica* determined that the catchall language "was intended to, and does, reduce analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause." *LinkAmerica*, 857 N.E.2d at 967. The Due Process Clause of the Fourteenth Amendment requires that a defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not

offend traditional notions of fair play and substantial justice." *Id*. (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)); *see also Boyer*, 42 N.E.3d at 507. Contacts are any acts physically performed in the forum state or acts performed outside the forum state that have an effect within the forum. *Wolf's Marine, Inc.*, 3 N.E.3d at 15 (quotations omitted).

[23] There are two types of personal jurisdiction, specific or case-linked jurisdiction and general or all-purpose jurisdiction. *See Simek v. Nolan*, 64 N.E.3d 1237, 1242 (Ind. Ct. App. 2016). The plaintiff need not prove the existence of both types of jurisdiction, as either one is sufficient. *Everdry*, 885 N.E.2d at 12. "[I]f the defendant has contacts with the forum state sufficient for general or specific jurisdiction, due process requires that the assertion of personal jurisdiction over the defendant is reasonable." *LinkAmerica*, 857 N.E.2d at 967; *see also Wolf's Marine, Inc.*, 3 N.E.3d at 15 (if a defendant has contacts sufficient for general or specific jurisdiction, "courts must then evaluate whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice").

[24] GmbH argues that the trial court has neither general nor specific personal jurisdiction over GmbH, "a foreign manufacturer that has absolutely no physical presence in Indiana and does not distribute or sell any pipe . . . directly to Indiana," and therefore the claims in the amended complaint against GmbH should be dismissed. *Appellant's Brief* at 14. Renaissance, on the other hand, maintains that GmbH "purposefully availed itself of conducting business in Indiana and the facts establish that the court has both general and specific

jurisdiction over it." *Appellee's Brief* at 20. We discuss each type of jurisdiction, in turn, as needed.

### *a. General Personal Jurisdiction*

General personal jurisdiction arises when a defendant's contacts are "so 'continuous and systematic' that the defendant should reasonably anticipate being haled into the courts of the state for any matter, . . . even in causes of action unrelated to the defendant's contacts with the foreign state." *Sebring v. Air Equip. & Eng'g, Inc.*, 988 N.E.2d 272, 275 (Ind. Ct. App. 2013). The contacts required for general personal jurisdiction are greater than those needed to establish specific personal jurisdiction. *Wolf's Marine*, 3 N.E.3d at 15; *North Texas Steel Co. v. R.R. Donnelley & Sons Co.*, 679 N.E.2d 513, 519 (Ind. Ct. App. 1997) ("[c]ourts are more demanding when jurisdiction is sustained only on a basis of general jurisdiction"), *trans. denied*, *cert. denied* (1998).

In *North Texas Steel Co.*, this court, in determining that the defendant did not have a systematic and continuous presence in Indiana, and no general personal jurisdiction existed, observed that there was no evidence of direct advertising or solicitation of Indiana residents and defendant did not have offices, employees, agents or property in Indiana. Similarly, in *Brokemond v. Marshall Field & Co.*, 612 N.E.2d 143, 145 (Ind. Ct. App. 1993), the court determined that advertising, delivering merchandise, collecting Indiana sales tax, and distributing credit cards in Indiana were insufficient to obtain general personal jurisdiction over an out-of-state defendant. *Id*. at 146.

In the present case, we agree with GmbH that its contacts are not so continuous and systematic that it would reasonably anticipate being haled into court in Indiana on any matter including one unrelated to the Renaissance lawsuit. That is, we do not find that GmbH's contacts are sufficient to confer general personal jurisdiction. We thus turn to whether its contacts support specific personal jurisdiction.

### b. Specific Personal Jurisdiction

A court may exercise specific personal jurisdiction over a defendant if the suit-related conduct is related to or arises out of the defendant's conduct within or directed to Indiana. *Boyer*, 42 N.E.3d at 511. "In other words, specific jurisdiction requires purposeful availment." *Simek*, 64 N.E.3d at 1242. When determining whether a court has specific personal jurisdiction over a defendant, courts consider the following factors: (1) whether the plaintiff's claim arises from the defendant's forum contacts; (2) the overall contacts of the defendant or its agent with the forum state; (3) the foreseeability of being haled into court in that state; (4) who initiated the contacts; and (5) whether the defendant expected or encouraged contacts with the state. *Id.* at 1243. The inquiry into whether a forum state may assert specific jurisdiction "'focuses on the relationship among the defendant, the forum, and the litigation.'" *Prof'l Billing, Inc. v. Zotec Partners, LLC*, 99 N.E.3d 657, 661 (Ind. Ct. App. 2018) (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)). A single contact with the forum state may be sufficient to establish specific jurisdiction over a defendant if it creates a substantial connection with the forum state and the suit is related to

that connection. *Simek*, 64 N.E.3d at 1243. However, a defendant cannot be haled into a jurisdiction "solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person." *LinkAmerica*, 857 N.E.2d at 967.

[29] GmbH maintains that Indiana does not have specific personal jurisdiction over it, arguing, "GmbH's strict manufacturing role in the process at issue began and ended in Europe" and that it "does not have any sales representatives or distributors in the United States and absolutely no involvement in the decision-making process regarding the marketing, resale and use of the product in the United States." *Appellant's Brief* at 37. In support, GmbH directs us to *Sebring*, 988 N.E.2d at 280, where the court determined that an out-of-state manufacturer defendant was not subject to jurisdiction.

[30] In that case, Sebring filed a complaint in 2012 after several of his fingers were amputated due to the alleged malfunction of a dust collector that he was using during his employment at OmniSource, a company in Fort Wayne. Sebring sued Donaldson Company, Inc., a Delaware corporation that manufactured the dust collector at its plant in Kentucky, and NCI, a Texas corporation, that manufactured a component (screw conveyor) for the dust collector in Texas. NCI filed a motion to dismiss for lack of personal jurisdiction, and in support it submitted the affidavit of its president stating, among other things, that NCI did not have employees or facilities in Indiana, it had a national advertising program that may have been directed to Indiana between March 1991 and October 1993 (but not since then), since January 2003 NCI had not had a sales

representative or distribution network in Indiana, Donaldson directed and arranged to ship the component to Fort Wayne, and NCI did not install or inspect the component at OmniSource and never had any contact with OmniSource or Sebring.

On appeal, Sebring conceded that general jurisdiction did not apply but argued that Indiana had specific personal jurisdiction. The *Sebring* court held that NCI's contacts with Indiana were too attenuated to support specific jurisdiction. The manufacturing process of the component part took place entirely within Texas, the decision to ship the screw conveyor to Indiana "was made unilaterally by Donaldson," and, "[i]n sum, it appears that NCI played no role in the decision to ship the screw conveyor to Indiana and its involvement in the transaction was complete when it tendered the screw conveyor to the carrier in Texas." *Id*. at 276. The *Sebring* court found that a defendant must do "something more" than placing a product in the stream of commerce. *Id*. at 280. The *Sebring* court's "something more" analysis relied on Justice Breyer's concurring opinion in *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011).

In *J. McIntyre*, the plaintiff Robert Nicastro, who worked in New Jersey, injured his hand while using a machine manufactured by a British company, J. McIntyre, and he filed a products liability case against J. McIntyre in New Jersey. The New Jersey Supreme Court found that personal jurisdiction existed relying primarily on the following three facts: (1) J. McIntyre's American distributor sold and shipped a machine to a New Jersey customer, at most, four

times; (2) J. McIntyre permitted and desired that its independent American Distributor sell its machines to anyone in the United States willing to buy them; and (3) representatives of J. McIntyre attended trade shows in such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco (but not in New Jersey). The New Jersey Supreme Court held that its courts "can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Id.* at 2785 (quotation omitted).

[33] A plurality of the United States Supreme Court disagreed and found that New Jersey did not have personal jurisdiction as the facts did not show that McIntyre engaged in any activities in New Jersey that revealed an intent to invoke or benefit from the protection of the state's laws, i.e., it did not purposefully avail itself of the New Jersey market. Justice Breyer, joined by another justice, concurred in the judgment, and, as quoted by the *Sebring* court, stated, in part:

> [T]here is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users.

*Sebring*, 988 N.E.2d at 278 (quoting *McIntyre*, 131 S. Ct. at 2792). GmbH argues that the "something more" standard was not met in this case and that it did "nothing more than place its product in the stream of commerce." *Appellant's Brief* at 28. We disagree.

[34] Initially, we observe that, unlike in *Sebring*, GmbH did not manufacture a component that was used in some other final product whose manufacturer shipped it elsewhere. Rather, GmbH delivered its completed product in the stream of commerce with the expectation that it would be purchased in various states, including Indiana. Its website linked interested United States users to www.aquatherm.com, which advertised a presence in the United States and specifically identified an Indianapolis company currently using its pipes, the Lifeline Data Center. The site also discussed GmbH, its history, growth, products, current projects using the pipe and different applications, and the ten-year warranty that GmbH provided.

[35] GmbH acknowledges that, in some cases, a website and national marketing may support contacts with a forum state, but argues that under *Elayyan v. Sol Melia, SA*, 571 F. Supp. 2d 886 (N.D. Ind. 2008), GmbH's website does not create sufficient presence in Indiana to subject GmbH to specific personal jurisdiction. In that case, Elayyan, an Indiana resident, was injured while in Mexico in a hotel's outdoor pool. Defendant Sol Melia was a Spanish corporation that was the owner of the Puerta Vallarta hotel where Elayyan was injured, and the other defendant was Sol Group, a Delaware corporation with its principal place of business in Florida, that provided marketing, sales, and

other services to companies associated with Sol hotels located outside of the United States. The defendants filed separate motions to dismiss, and Elayyan did not timely file a response. The trial court granted the uncontested motions to dismiss.

[36] On appeal, the *Elayyan* court, in deciding whether personal jurisdiction could be properly exercised over the defendants based on their websites, utilized a three-step sliding scale test established in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). The *Zippo* test categorizes websites as (i) passive sites, through which defendants provide basic information but "do[] little more than make information available", (ii) interactive sites, which "allow users to exchange information with the host" operator, or (iii) transactional sites, where a defendant "clearly does business over the Internet" such as entering into contracts with residents of a foreign jurisdiction. *Id*. Passive sites are not grounds for the exercise of personal jurisdiction, transactional sites confer automatic jurisdiction, and interactive sites require examination of "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id*. In affirming the trial court's grant of the motion to dismiss, the *Elayyan* court observed that Sol Melia's website was targeted at a worldwide audience, allowed users to make reservations directly with Sol-brand hotels, and did not target Indiana residents or use the word "Indiana" anywhere on the site. As to Sol Group's website, it was targeted at its employees and professionals affiliated with the Sol-brand hotels and the public could not exchange information with Sol Group on the site. Elayyan had booked his

travel through a travel agent, and had not accessed information through either of the defendants' websites.

[37] In the present case, GmbH urges that on the *Zippo* sliding scale analysis, its website or online presence was, at best, "passive" and insufficient to subject it to personal jurisdiction in Indiana. We disagree with this characterization and, instead, find that the site was "interactive." GmbH's site, www.aquatherm.de, directed users interested in United States applications of the pipe to click a flag which took the user to www.aquatherm.com. There, the user was advised of the existence of sales representatives in Indiana and invited to click for further information. It offered the opportunity to subscribe to e-newsletters, had real-time chat boxes available on different pages, showcased an ongoing project in Indiana, and advised of the availability of Indiana distributors. We find this distinguishable from the situation and the websites in *Elayyan*.

[38] Additionally, GmbH's manufacturer's warranty, which was promoted online, did not attach automatically to each and every product, but, rather, would become effective only after GmbH received verification that the product had been installed by certified installers pursuant to outlined criteria and a successful pressure test had been conducted by an approved tester and submitted. The warranty required that, in the event of a material failure, Aquatherm NA would collect samples of damaged product and would work "in collaboration with aquatherm GmbH" to identify the cause of the damage and that a claim had to "be made to aquatherm via the national aquatherm GmbH partners." *Appellant's Appendix Vol. II* at 219-20. GmbH would review the

information for compliance and, if complete, issue a warranty to the buyer. The warranty thus necessitated GmbH's continued involvement with the end-user of its product. Medve averred that GmbH's warranty was part of Renaissance's decision to use GmbH product.

[39] Renaissance's claims against GmbH arise from these contacts, and, accordingly, we find that asserting jurisdiction would not be based on random, fortuitous, or attenuated contact with Indiana. Considering the relationship "among the defendant, the forum, and the litigation," *Zotec Partners,* 99 N.E.3d at 661, we find that GmbH's activities, including its online presence and warranty, reflect that it expected or encouraged contacts with Indiana and that it has sufficient contacts with Indiana to support specific personal jurisdiction. *See North Texas Steel*, 679 N.E.2d at 519 (finding that Texas manufacturer of storage rack systems had purposefully availed itself of the privilege of conducting business in Indiana, and Indiana had specific personal jurisdiction over it, where manufacturer had shipped the racks to Indiana, through a relationship with its distributor, and did so with knowledge that the product was for use by a Warsaw, Indiana company).

[40] Having so found, we next move to the "reasonableness" inquiry. *See Wolf's Marine, Inc.*, 3 N.E.3d at 16 (fairness inquiry is separate from the contacts question and may be used to defeat jurisdiction even if defendant has sufficient contacts with forum state). In determining the reasonableness of exercising jurisdiction over a defendant, courts consider the following five factors: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the

dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *LinkAmerica*, 857 N.E.2d at 967-68 (quoting *Burger King. Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985)). These interests must be balanced and weighed to make certain that asserting jurisdiction is fair in a particular case.

[41] GmbH sold its product (completed pipe) that was intended for use in the United States to Aquatherm NA or Aquatherm, LP, which marketed and sold the pipe to, among others, Columbia Pipe. An extensive amount of GmbH pipe was installed in the Towers, two ten-story buildings that house residents. As the Towers encountered failures with the pipe, the water supply to residents, which Renaissance states in its complaint were elderly individuals, was affected. We find that under these circumstances Indiana has an interest in adjudicating the dispute. According to Renaissance, all the defendants named in the lawsuit, but for GmbH, have consented to jurisdiction in Indiana, and thus Indiana would provide the most convenient and effective location for plaintiff to seek and obtain relief. GmbH has not established or expressly argued the existence of a burden in litigating the matter in Indiana. Judicial economy favors deciding the action in a single action. *See North Texas Steel*, 679 N.E.2d at 519 (recognizing the interstate judicial system's interest "in the resolution, in a single action, of a controversy involving parties from four states"). We

conclude that Indiana's exercise of specific personal jurisdiction over GmbH would be fair and comport with federal due process requirements.

[42] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.