## FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DAVID M. LUTZ**
David M. Lutz LLC
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE NEWTON
CONVEYORS, INC.:

**JAMES P. FENTON**
Eilbacher Fletcher, LLP
Fort Wayne, Indiana

FILED
Apr 04 2013, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOHN V. SEBRING, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02A05-1211-PL-566 |
| | ) | |
| AIR EQUIPMENT AND ENGINEERING, INC., | ) | |
| DONALDSON COMPANY, INC., WILLIAM | ) | |
| W. MEYER AND SONS, INC., NEWTON | ) | |
| CONVEYORS, INC., and EMERSON POWER | ) | |
| TRANSMISSION CORPORATION, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Daniel G. Heath, Judge
Cause No. 02D01-1203-PL-96

**April 4, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

John V. Sebring was injured while using a dust collector at his workplace in Fort Wayne, Indiana. A component of the dust collector was manufactured by Newton Conveyors, Inc. ("NCI"), a Texas corporation. Sebring sued NCI and several other defendants in Indiana. NCI filed a motion to dismiss for lack of personal jurisdiction, which the trial court granted.

Sebring appeals the dismissal. NCI's role in the manufacturing process took place entirely within Texas, and the manufacturer of the final product unilaterally decided to ship the product to Indiana. Under these circumstances, NCI's contact with Indiana is too attenuated to support jurisdiction. Therefore, we affirm.

**Facts and Procedural History**

On March 22, 2012, in Allen Superior Court, Sebring filed a complaint, which alleged that several of his fingers were amputated due to the malfunction of a modular baghouse dust collector unit that he was using at his job at OmniSource. OmniSource is located in Fort Wayne, Indiana. The dust collector was manufactured by Donaldson Company, Inc. ("Donaldson"), which is incorporated under the laws of Delaware and has a plant in Nicholasville, Kentucky. Donaldson purchased a component part, a screw conveyor, from NCI, which is incorporated under the laws of Texas and has its sole place of business in Cleburne, Texas. Donaldson and NCI were among the defendants named in Sebring's complaint.

On June 12, 2012, NCI filed a motion to dismiss for lack of personal jurisdiction.

NCI submitted a memorandum in support of its motion, along with an affidavit from NCI's president and documentation of the sale of the screw conveyor. The affidavit states that NCI does not have any employees or facilities in Indiana. Between March 1991 and October 1993, NCI "had a national advertising program via fax, portions of which may have been directed to Indiana," but since then, NCI has not done any advertising in Indiana. Appellant's App. at 72. NCI does not have a telephone number or listing in Indiana. Between June 15, 2001, and January 31, 2003, NCI had an independent sales representative in Ohio whose territory included northern Indiana; however, NCI has no record of any sales being made in Indiana during this time. Since January 31, 2003, NCI has not had a sales representative or a distribution network in Indiana. NCI does not hold any Indiana business licenses, nor does it have any "ongoing business relationships with any Indiana residents." *Id*. at 73.

The affidavit gives the following account of the transaction between NCI and Donaldson:

> 42. On January 31, 2005, Donaldson faxed from its Nicholasville, Kentucky facility, a purchase order to NCI requiring NCI to have the screw conveyor ready for shipment by March 9, 2005. This purchase order was accepted by NCI on January 31, 2005 by a fax transmission to Donaldson's facility in Nicholasville, Kentucky ….
>
> 43. By agreement of NCI and Donaldson the shipping date was changed to March 25, 2005.
>
> 44. In addition, on January 31, 2005, Donaldson's purchase order informed NCI that the destination for the conveyor was "OmniSource, 7625 Vicksburg Pike, Fort Wayne, Indiana 46804." The Donaldson purchase order

3

specified that the shipment would be "F.O.B.[1] ORIGIN SHIPPING POINT," which was NCI's facility in Cleburne, Texas.

45. On March 22, 2005, ATS truck line picked up the conveyor, F.O.B. at NCI's location in Cleburne, Texas, for shipment to OmniSource's location in Fort Wayne, Indiana .…

46. All freight charges were paid by Donaldson and Donaldson chose the carrier, ATS truck line.

47. Ordinarily, Donaldson would have had NCI direct this conveyor to Donaldson's plant in Nicholasville, Kentucky. However, because Donaldson wished to expedite delivery of the goods to OmniSource's location, Donaldson arranged for the destination of the conveyor to be the OmniSource location in Fort Wayne, Indiana.

48. Donaldson is a manufacturer of dust collectors, and from time to time it has purchased conveyors from NCI to be used with Donaldson's dust collectors.

49. NCI's business records indicate that in the ten years 2002 to the present, NCI products have been shipped to Indiana only six times. Five of these shipments were made for Donaldson, and all such shipments were "F.O.B. Cleburne, Texas." One of these shipments was the shipment which Donaldson directed to OmniSource in Fort Wayne, Indiana. In all five cases, Donaldson chose the carrier, and Donaldson paid all freight charges .…

50. In addition, one of the six shipments was to the Romweber Company, located in Batesville, Indiana. This shipment was also F.O.B. Cleburne, Texas, and Romweber paid all freight charges .…

51. The total revenue NCI derived from the conveyor Donaldson had NCI direct to Indiana in March 2005 was $10,286.00. Adding in the replacement parts shipped to Indiana for Donaldson over the past ten years and the Romweber shipment, NCI's total revenue from all products shipped to Indiana, including the March 2005 conveyor, over ten years was $20,427.00. This represents only .003% of NCI's total revenues over the past ten years.

52. NCI did not install or inspect the March 2005 conveyor at

---

[1] "F.O.B." stands for "free on board." The meaning and import of this term is explained in more detail in the "Discussion and Decision" section of this opinion, *infra*.

OmniSource and no employee, representative, or agent of NCI performed any work on the conveyor after it was delivered to Donaldson's carrier on March 22, 2005. NCI has never had any contact with OmniSource or the Plaintiff in this case, Mr. Sebring.

*Id*. at 74-75.

On October 8, 2012, the trial court granted NCI's motion to dismiss. Sebring appeals from this order.

## Discussion and Decision

Personal jurisdiction is a question of law. *LinkAmerica Corp. v. Albert*, 857 N.E.2d 961, 965 (Ind. 2006). Therefore, our review is de novo, and we do not defer to the trial court's legal conclusion as to whether personal jurisdiction exists. *Id*. However, to the extent that the issue of personal jurisdiction turns on disputed facts, the trial court's findings of fact are reviewed for clear error. *Id*.

Indiana Trial Rule 4.4(A) serves as Indiana's long-arm jurisdiction provision. *Id*. This provision extends to the limits of the United States Constitution; therefore, analysis of personal jurisdiction is reduced "to the issue of whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause." *Id*. at 967.

> The Due Process Clause of the Fourteenth Amendment requires that before a state may exercise jurisdiction over a defendant, the defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)). If the defendant's contacts with the state are so "continuous and systematic" that the defendant should reasonably anticipate being haled into the courts of that state for any matter, then the defendant is subject to general jurisdiction, even in causes of action unrelated to the defendant's

contacts with the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 n. 9, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).

If the defendant's contacts with the forum state are not "continuous and systematic," specific jurisdiction may be asserted if the controversy is related to or arises out of the defendant's contacts with the forum state. *Id*. at 414 & n.8, 104 S. Ct. 1868. Specific jurisdiction requires that the defendant purposefully availed itself of the privilege of conducting activities within the forum state so that the defendant reasonably anticipates being haled into court there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). A single contact with the forum state may be sufficient to establish specific jurisdiction over a defendant, if it creates a "substantial connection" with the forum state and the suit is related to that connection. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957). But a defendant cannot be haled into a jurisdiction "solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475, 105 S. Ct. 2174 (internal quotation marks omitted) (citing *Helicopteros*, 466 U.S. at 417, 104 S. Ct. 1868; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

*Id*.

Sebring concedes that NCI is not subject to general jurisdiction in Indiana; however, Sebring argues that there is specific jurisdiction pursuant to *North Texas Steel Company, Inc. v. R.R. Donnelley & Sons Co.*, 679 N.E.2d 513 (Ind. Ct. App. 1997) *trans. denied, cert. denied* (1998). In that case, R.R. Donnelley ("RRD") entered into a contract with Associated Material Handling Industries, an Illinois corporation, for a material handling system including storage racks, sophisticated forklifts, conveyors, and other related equipment for RRD's facility in Warsaw, Indiana. Associated Material Handling subcontracted the storage rack design and manufacture to Frazier Industrial Company, a New Jersey corporation, which contracted with NTS, a Texas corporation, to fabricate the rack system according to Frazier's

6

design. After completing the rack system, NTS shipped it to RRD's Warsaw facility at Frazier's expense. A few months after the racks were installed, they collapsed and damaged the products stored on the racks.

RRD filed suit against Associated Material Handling, Frazier, and NTS. NTS filed a motion to dismiss for lack of personal jurisdiction, which the trial court denied. On appeal, we agreed that the trial court had specific personal jurisdiction over NTS:

> NTS specifically manufactured the rack system for a corporation located in Indiana and then shipped that system to Indiana. The acts of manufacturing and shipping were done with the knowledge that the system was for use by RRD in Indiana. The evidence does not indicate that NTS was a "local" company which "happened" to expand its business into Indiana. Instead, the evidence indicates NTS had a twelve year relationship with Frazier, a New Jersey company. Pursuant to this relationship, Frazier provided NTS with customers for rack systems, including four customers in Indiana. NTS, through its relationship with Frazier, purposely availed itself of the privilege of conducting business in Indiana, and it cannot complain that jurisdiction is being asserted by an Indiana court upon the basis of a "random, fortuitous, or attenuated" contact with the state.

*Id*. at 519.

NCI argues that *North Texas Steel* is distinguishable and that the rationale of that case has been eroded by more recent cases from the Indiana Supreme Court and the Supreme Court of the United States. First, NCI argues that, unlike the manufacturer in *North Texas Steel*, NCI was not responsible for shipping the product to Indiana. The purchase order indicated that the shipment would be "F.O.B. Cleburne, TX." Appellant's App. at 80. NCI asserts, and Sebring does not dispute, that the contract between NCI and Donaldson would most likely be governed by the law of Texas or Kentucky, both of which have adopted the Uniform Commercial Code ("UCC"). Pursuant to UCC Section 2-319, "F.O.B. the place of

7

shipment" means that the seller must place the goods in the possession of the carrier at that place. *See* Tex. Bus. & Com. Code Ann. § 2-319(a)(1); Ky. Rev. Stat. Ann. § 355.2-319(1)(a). Thus, NCI argues that "Donaldson took possession of the goods in Texas upon NCI's tender of delivery to the carrier, and it was *Donaldson* that transported the goods into Indiana, using its chosen carrier." Appellee's Br. at 11. NCI further argues that, although NCI was aware that Donaldson planned to ship the screw conveyor to Indiana, once NCI tendered the product to the carrier, Donaldson could have redirected the shipment anywhere it wanted.

Based on the affidavit of NCI's president, it appears that the decision to ship the screw conveyor to Indiana was made unilaterally by Donaldson. NCI's ordinary practice was to ship goods to Donaldson's plant in Kentucky. The screw conveyor was shipped to Indiana only because Donaldson wanted to expedite the delivery to its customer, OmniSource. In sum, it appears that NCI played no role in the decision to ship the screw conveyor to Indiana and its involvement in the transaction was complete when it tendered the screw conveyor to the carrier in Texas. Although Sebring characterizes NCI as the shipper of the screw conveyor, it does not appear to dispute any of the factual statements in the affidavit nor NCI's interpretation of the term "F.O.B. the place of shipment."

Relying primarily on *LinkAmerica* and *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), NCI also argues that the reasoning of *North Texas Steel* has been undermined since that case was decided in 1997. In *LinkAmerica*, an Indiana resident, William Cox, entered into an agreement with Hi-Cube Express in which Cox purchased a

8

semi-tractor from Hi-Cube and leased it back to Hi-Cube. Hi-Cube later terminated the lease and repossessed the truck. Cox sued Hi-Cube and later attempted to add Hi-Cube's parent corporation, LinkAmerica, as a defendant. LinkAmerica was an Oklahoma corporation and had no direct involvement in the transaction between Cox and Hi-Cube. LinkAmerica filed a motion to dismiss for lack of personal jurisdiction, which the trial court denied. Our supreme court reversed. The supreme court's analysis started "with the presumption that a parent and a subsidiary are independent entities and a subsidiary's contacts with the forum are not attributed to the parent corporation for jurisdictional purposes." *LinkAmerica*, 857 N.E.2d at 968.

> Overcoming this presumption requires clear evidence that either: (1) the parent utilizes its subsidiary in such a manner that an agency relationship can be perceived; (2) the parent has greater control over the subsidiary than is normally associated with common ownership and directorship; or (3) the subsidiary is merely an "empty shell."

*Id.* In the instant case, Sebring did not have to overcome a presumption against jurisdiction, and we conclude that *LinkAmerica* is not sufficiently analogous to provide guidance.

In *J. McIntyre*, Robert Nicastro, who worked in New Jersey, injured his hand while using a metal-shearing machine manufactured by a British company, J. McIntyre. Nicastro filed a products liability suit against J. McIntyre in New Jersey. J. McIntyre argued that it was not subject to personal jurisdiction in New Jersey. The Supreme Court of New Jersey found that personal jurisdiction existed, relying primarily on the following three facts:

> (1) [J. McIntyre's] American Distributor on one occasion sold and shipped one machine to a New Jersey customer, namely, Mr. Nicastro's employer, Mr. Curcio; (2) the British Manufacturer permitted, indeed wanted, its independent American Distributor to sell its machines to anyone in America willing to buy

9

them; and (3) representatives of the British Manufacturer attended trade shows in such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco.

*J. McIntyre*, 131 S. Ct. at 2791 (Breyer, J., concurring) (quotation omitted). The Supreme Court of New Jersey held that its courts "can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Id*. at 2785 (quotation omitted). A plurality consisting of Justice Kennedy, Chief Justice Roberts, Justice Scalia, and Justice Thomas rejected that holding and held that New Jersey did not have personal jurisdiction over J. McIntyre. Justice Breyer, joined by Justice Alito, concurred in the judgment, but disagreed with the plurality's analysis.

When a fragmented court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S.153, 169 n.15 (1976)). NCI asserts that Justice Breyer's opinion is the narrowest ground for the decision, and Sebring likewise focuses his analysis on Justice Breyer's opinion.

Justice Breyer felt that the plurality opinion introduced a new, strict rule that limited jurisdiction when the defendant does not intend to submit to the power of a sovereign and cannot be said to have targeted the forum. *J. McIntyre*, 131 S. Ct. at 2793 (Breyer, J.,

10

concurring) (citing the plurality opinion at page 2788). Justice Breyer felt that the case could

be resolved by applying existing precedent:

> None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, this Court's previous holdings suggest the contrary. The Court has held that a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place. *See Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 111, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (opinion of O'Connor, J.) (requiring "something more" than simply placing "a product into the stream of commerce," even if defendant is "awar[e]" that the stream "may or will sweep the product into the forum State"); *id*., at 117, 107 S. Ct. 1026 (Brennan, J., concurring in part and concurring in judgment) (jurisdiction should lie where a sale in a State is part of "the regular and anticipated flow" of commerce into the State, but not where that sale is only an "edd[y]," i.e., an isolated occurrence); *id.*, at 122, 107 S. Ct. 1026 (Stevens, J., concurring in part and concurring in judgment) (indicating that "the volume, the value, and the hazardous character" of a good may affect the jurisdictional inquiry and emphasizing Asahi's "regular course of dealing").

> Here, the relevant facts found by the New Jersey Supreme Court show no "regular ... flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users. *World-Wide Volkswagen*, *supra*, at 297-298, 100 S. Ct. 559 (internal quotation marks omitted).

*Id*. at 2792.

However, Justice Breyer did agree with the plurality that the approach taken by the

New Jersey Supreme Court was inappropriate:

> But though I do not agree with the plurality's seemingly strict no-jurisdiction rule, I am not persuaded by the absolute approach adopted by the New Jersey Supreme Court and urged by respondent and his *amici*. Under that view, a producer is subject to jurisdiction for a products-liability action so long as it "knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." [*Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d 575, 592 (N.J. 2010)] (emphasis added). In the context of this case, I cannot agree.
>
> For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977) (emphasis added). It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum State. But this Court has rejected the notion that a defendant's amenability to suit "travel[s] with the chattel." *World-Wide Volkswagen*, 444 U.S., at 296, 100 S. Ct. 559.

*Id*. at 2793 (Breyer, J., concurring).

Sebring argues that "[a]ll that can be said about the *J. McIntyre Machinery, LTD*

decision is that Nicastro did not meet his burden of proof in establishing specific

jurisdiction."[2] Appellant's Reply Br. at 4. However, Sebring acknowledges that the reason

---

[2] Federal courts have held that when they are exercising diversity jurisdiction, the burden of proof is on the party seeking to invoke the jurisdiction of the federal court. *Purdue Research Found. v. Sanofi-Synthelab, S.A.*, 338 F.3d 773, 782 n.11 (7th Cir. 2003). By contrast, Indiana courts have stated that the party challenging jurisdiction bears the burden of proof. *See*, *e.g.*, *N. Tex. Steel*, 679 N.E.2d at 519. These cases appear to stem from *Weenig v. Wood*, 169 Ind. App. 413, 420-21, 349 N.E.2d 235, 240-41 (1976). The *Weenig* court's reasoning was based on Indiana Trial Rule 8(C), which lists lack of jurisdiction as an affirmative defense and states that the defendant bears the burden of proving an affirmative defense. The court also based its reasoning on the fact that Indiana trial courts (unlike federal courts) are courts of general jurisdiction and jurisdiction is presumed. *Id.* at 419, 349 N.E.2d at 240.

that Justice Breyer found that Nicastro had not met his burden of proof was because he "felt that something more than simply placing a product into the stream of commerce was required for specific jurisdiction to exist." *Id*. at 5. Sebring argues that the "something more" in this case is that NCI had "actual knowledge" that it "was designing, manufacturing, assembling, performing test runs and quality control as well as approving and preparing a screw conveyer that was for use by an Indiana company." *Id*. However, mere knowledge that a product would end up in a particular state after being placed in the stream of commerce does not resemble any of the examples that Justice Breyer provided of "something more," such as a state-specific design, advertising, or advice. *J. McIntyre*, 131 S. Ct. at 2792. Furthermore, as discussed above, all of NCI's actions relating to this case took place within Texas, the

---

In *Anthem Insurance Companies, Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227 (Ind. 2000), our supreme court took a more nuanced approach to the burden of proof. At that time, Indiana Trial Rule 4.4 listed specific bases for exercising personal jurisdiction over a non-resident. *Id*. at 1232. Thus, courts applied a two-step process: "First, the court must determine if the defendant's contacts with the forum state fall under the long-arm statute. Second, if they do, the court must then determine whether the defendant's contacts satisfy federal due process analysis." *Id*. When discussing application of the Indiana Trial Rules, *Anthem* stated that when the defendant raises the issue of personal jurisdiction, the plaintiff "must present evidence to show that there is personal jurisdiction over the defendant," but the burden of proving the lack of personal jurisdiction by a preponderance of the evidence remains on the defendant. *Id*. at 1231. When discussing the constitutional prong of the analysis, *Anthem* stated that the plaintiff must establish that the defendant has sufficient minimum contacts with the state, and then the defendant bears the burden of proving that asserting jurisdiction is unfair and unreasonable. *Id*. at 1237 (citing *Burger King*, 471 U.S. at 477).

In 2003, Indiana Trial Rule 4.4(A) was amended to extend to the limits of the United States Constitution, rather than a finite list of circumstances. *LinkAmerica*, 857 N.E.2d at 967. Thus, *LinkAmerica* concluded that the 2003 amendment "was intended to, and does, reduce analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause." *Id*. Therefore, *LinkAmerica* proceeded directly to analysis of federal due process and did not mention the rule from the *Weenig* line of cases that the defendant bears the burden of proving the lack of jurisdiction.

Although some Indiana cases continue to state that the party challenging jurisdiction bears the burden of proof, *see*, *e.g.*, *Foley v. Schwartz*, 943 N.E.2d 371, 378-79 (Ind. Ct. App. 2011) *trans. denied*, those cases appear to overlook the fact that *Anthem* applied the same standard as federal cases when analyzing the constitutional issue – the only prong of the analysis that is still pertinent. However, we acknowledge that Indiana Trial Rule 8(C) still purports to place the burden on the defendant.

13

decision to ship the product to Indiana was made by Donaldson, and Donaldson took responsibility for sending the product to Indiana. We cannot agree that NCI did "something more" than placing the screw conveyor in the stream of commerce. Therefore, we affirm the judgment of the trial court.

Affirmed.

BAKER, J., and MATHIAS, J., concur.

---

Neither party has discussed the applicable burden of proof in this case. However, we believe that the undisputed evidence in this case demonstrates that we do not have jurisdiction regardless of which party bore the burden of proof.