



FILED
May 02 2025, 10:23 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

PTI Union, LLC, Black Creek Corporation, Broadview Investments, LLC, Edward T. Noland, Jr., Irrevocable Gifting Trust, Tarrasch Family Trust, Revocable Living Trust of Edward T. Noland, Jr., and Laura Noland Tarrasch Revocable Trust,

*Appellants-Defendants*

v.

Michele McBride, on her own behalf and as Personal Representative of the Estate of Ronald McBride,

*Appellee-Plaintiff*

---

May 2, 2025

Court of Appeals Case No.
24A-MI-931

Appeal from the Marion Superior Court

The Honorable James A. Joven, Judge
The Honorable Therese Hannah, Magistrate

**Opinion by Judge Vaidik**
Chief Judge Altice and Judge Scheele concur.

**Vaidik, Judge.**

## Case Summary

[1]     After Ronald McBride was diagnosed with mesothelioma, he and his wife, Michele, commenced a mass-tort proceeding in Marion Superior Court alleging that over twenty defendants manufactured, sold, or distributed asbestos-containing talcum-powder products, which caused his mesothelioma. This appeal concerns seven of those defendants, none of which are located in Indiana. These seven defendants moved to dismiss the complaint for lack of personal jurisdiction under Indiana Trial Rule 12(B)(2), which the trial court denied. The court certified its order for interlocutory appeal, and we accepted jurisdiction.

[2]     Because the seven defendants are not incorporated in Indiana, do not have their principal place of business here, and have not "purposefully availed" themselves of the privilege of conducting business in Indiana, there is no personal jurisdiction. The trial court therefore erred in denying their motions to dismiss.

## Facts and Procedural History[1]

In August 2021, Ronald was diagnosed with malignant pleural mesothelioma. That October, Ronald and Michele commenced a mass-tort proceeding in Marion Superior Court alleging that many defendants manufactured, sold, or distributed asbestos-containing talcum-powder products, which Ronald used from 1970 to 2021 while living in Indiana and Florida and which caused his mesothelioma.

Ronald died in November 2022, and his estate was substituted for him. Michele now appears individually and as the personal representative of Ronald's estate (collectively, "Michele").

Michele later amended the complaint to add seven defendants, which are the appellants here (collectively, "the Appellants"). The first added defendant is PTI Union, LLC, which is a Delaware limited-liability company with its principal place of business in Missouri. PTI Union is a contract manufacturer that blends and bottles products to customer specifications. *See* Appellants' App. Vol. III p. 76. As relevant here, PTI Union contracted to blend and bottle Caldesene talcum powder for Insight Pharmaceuticals, a Pennsylvania company.[2] According to Michele, "over 200,000 bottles" of Caldesene were

---

[1] We held oral argument on April 14, 2025, in the Court of Appeals courtroom. We thank counsel for their helpful presentations.

[2] Insight Pharmaceuticals is a defendant in this case but not one of the seven appellants here.

shipped from PTI Union in Missouri to a warehouse in Plainfield, Indiana, "over a period of years." Appellee's Br. p. 25.

[6] The second added defendant is Black Creek Corporation, PTI Union's predecessor, which was a Missouri corporation with its principal place of business in Missouri that dissolved in 2012. *See* Appellants' App. Vol. III p. 73. As relevant here, in 2005, Black Creek manufactured 125,000 bottles of Caldesene for Insight, which were then shipped to a warehouse in Plainfield.

[7] The third added defendant is Broadview Investments, LLC, which is a Delaware limited-liability company with its principal place of business in Georgia. Michele alleges that Broadview is the holding company of PTI Union. *See id.* at 74.

[8] The last four added defendants are trusts (none of the trusts was created in Indiana, and none of the trustees lives in Indiana): the Edward T. Noland, Jr., Irrevocable Gifting Trust, the Tarrasch Family Trust, the Revocable Living Trust of Edward T. Noland, Jr., and the Laura Noland Tarrasch Revocable Trust (collectively, "the Trusts"). Michele alleges that the Trusts comprise the membership of Broadview. *See id.* at 74, 75, 76, 77.

[9] In May 2023, PTI Union moved to dismiss the complaint for lack of personal jurisdiction under Indiana Trial Rule 12(B)(2). PTI Union attached the following affidavit from Michael Brasher, its Director of Quality:

3. PTI Union, LLC was formed as a Delaware limited liability company on November 13, 2007, and its principal place of business is, and always has been, in Missouri.

4. PTI Union, LLC is a contractor that blends and bottles products to customer specifications at a facility in Union, Missouri.

5. At certain times, PTI Union, LLC contracted with Insight Pharmaceuticals to blend and bottle talc-containing Caldesene powder to Insight Pharmaceutical[s'] specifications.

6. Insight Pharmaceuticals controlled, directed and paid for the shipment of Caldesene powder from PTI Union, LLC's Missouri facility.

7. Insight Pharmaceuticals approved the release of the product and directed when, where and how shipments were made. Specifically, Insight Pharmaceuticals determined which carrier was used to transport the goods, paid for the carrier, and designated the facility to which the carrier would deliver the product. *See* Quality Agreement, attached as Ex. 1; *See also* Release Procedures for Insight Pharmaceuticals, attached as Ex. 2.

8. At certain times, Insight Pharmaceutical[s] directed PTI Union, LLC to coordinate shipment of Caldesene powder using a third-party carrier selected by Insight to a designated facility, one of which was located in Plainfield, Indiana. *See* Insight Pharmaceuticals' Acceptance Record/Retain Forms attached as Exhibit 3.

9. For practical reasons, PTI Union, LLC scheduled pick-up times with the third party carriers because [PTI] Union had

access to its own dock availability. The third-party carrier then picked up the product in Missouri and delivered it to a facility pre-determined by [PTI] Union's customer, Insight.

10. Insight owned and controlled the Caldesene product at the time Caldesene was picked up from the loading docks in Missouri by the Insight-designated carrier.

11. PTI Union, LLC played no role in the decisions regarding where Caldesene powder would be shipped or distributed, including to Indiana or anywhere else.

12. Further, PTI Union, LLC played no role in determining the content of the labeling, final release and distribution of the product, marketing of the product or sale of any Caldesene powder to consumers in Indiana or anywhere else.

*Id.* at 135-36 (footnotes omitted). As indicated above, PTI Union attached three documents to the affidavit: (1) a "Quality Agreement" between Insight and PTI Union; (2) an Insight document entitled "Release Procedures for Insight Pharmaceuticals"; and (3) "Insight Pharmaceuticals Acceptance Release Record/Retain Form." *See* Appellants' App. Vol. VI pp. 12, 34, 37.

[10] PTI Union argued it isn't subject to general jurisdiction in Indiana because it is neither incorporated here nor has its principal place of business here. PTI Union also argued it isn't subject to specific jurisdiction in Indiana:

[PTI] Union *does nothing* in Indiana, period. [PTI] Union blends and bottles products to customer specification at a facility in Union, Missouri. One such customer included Insight Pharmaceuticals ("Insight"), for which [PTI] Union blended and

bottled talc-containing Caldesene at certain times. [PTI] Union's role with Caldesene, however, began and ended in Union, Missouri; Insight—not [PTI] Union—thereafter controlled and directed the shipment of the product from Missouri to a facility *Insight* designated, one of which was located in Plainfield, Indiana. Insight alone determined which third-party carrier would transport the product, paid for the carrier, and designated the facility to which the carrier would deliver the product. [PTI] Union therefore played no role in the shipment of the Caldesene from its facility. Its role with respect to Caldesene ended at its Union, Missouri loading docks, from which point Caldesene was a product owned and controlled by Insight.

Appellants' App. Vol. III p. 122 (record citations omitted). Black Creek, Broadview, and the Trusts also moved to dismiss for lack of personal jurisdiction. *See id.* at 137; Appellants' App. Vol. IV pp. 2, 107, 119; Appellants' App. Vol. V pp. 2, 19.

[11] In December 2023, the trial court heard oral argument on the Appellants' motions to dismiss. On January 22, 2024, the trial court denied the motions. As to PTI Union, the trial court found:

PTI Union was formed in November of 2007 and began operations in April of 2008, the result of "an asset sale that took place between Pharma Tech Industries and PTI Union, LLC. From April 1, 2008, until 2017, PTI Union blended, bottled and packaged talc containing Caldesene under a contractual relationship with Insight. PTI Union was a "Contract Manufacturer", defined as a "supplier". As a supplier, PTI Union was responsible for the proper condition of all raw material; for manufacturing and packaging of the product; responsible for quality control and testing procedures in accordance with contract provisions; responsible for

documentation and sampling of the product; responsible for reporting any deviations in the product; responsible for transporting the manufactured product under the appropriate environmental conditions; and, responsible for providing Insight with documentation for the Product Acceptance procedure signed certificate of analysis, certificate of conformance, and various certificate[s] of compliance or approval.

Over a period of years, PTI Union manufactured and released the Caldesene powder product in Missouri. The Caldesene was then was [sic] shipped to Insight's warehouse in Plainfield, Indiana. Insight ordered for the manufacture and delivery of 125,000 containers of Caldesene Talc delivered to Plainfield, Indiana on 5/24/2005. Later orders were for 26,568 bottles on 5/4/2009; 33,360 bottles on or about 12/21/2009; and 33,144 bottles on 10/12/11. In addition, there is designated evidence that Insight Pharmaceuticals received a shipment in Indiana of 32,904 bottles of Caldesene from PTI Union on 3/16/2010.

The Court FINDS that PTI Union's ongoing contractual relationship for the production of Caldesene powder along with the volume of Caldesene powder regularly shipped to Indiana over a period of years, creates a substantial connection to Indiana such that PTI Union could reasonably anticipate being called into court here to defend itself for an injury caused by the product they manufactured.

Appellants' App. Vol. VI pp. 5-6 (record citations omitted).

[12]     As to Black Creek, the trial court found:

> Black Creek acknowledges it is PTI Union's successor[3] corporation. Black Creek designated evidence that [it] shipped 125,000 bottles of Caldesene to Plainfield, Indiana on 9/08/2005.
>
> The Court FINDS the proof of shipment of 125,000 bottles of Caldesene to Indiana by Black Creek supports a finding of an ongoing contractual relationship for the production of Caldesene powder. The volume of Caldesene powder shipped to Indiana during the period of the contract, supports a finding of a substantial connection to Indiana such that Black Creek could reasonably anticipate being called into court here to defend itself for an injury caused by the product they manufactured.

*Id.* at 6-7 (record citations omitted, footnote omitted).

[13] As for Broadview and the Trusts, the trial court found:

> Broadview Investments is a Delaware limited liability corporation incorporated in 2005, with its principal place of business in Georgia. Broadview Investments, LLC is the sole member and holding company of PTI Union, LLC. The four Trusts constitute Broadview's membership: (a) Revocable Living Trust of Edward T. Noland, Jr.; (b) Edward T. Noland, Jr. Irrevocable Gifting Trust; (c) Laura Noland Tarrasch Revocable Trust; and (d) Tarrasch Family Trust.

*Id.* at 7 (record citations omitted).

---

[3] According to Black Creek, it is PTI Union's predecessor, not successor. *See* Black Creek's Br. p. 7.

Thereafter, PTI Union moved to certify the trial court's January 22 order for interlocutory appeal. Black Creek, Broadview, and the Trusts joined PTI Union's motion. The trial court certified its order for interlocutory appeal. PTI Union then filed in this Court a motion to accept jurisdiction over interlocutory appeal, which Black Creek, Broadview, and the Trusts also joined. We accepted jurisdiction.[4]

This appeal now ensues.[5]

## Discussion and Decision

The Appellants contend the trial court should have granted their motions to dismiss based on lack of personal jurisdiction under Trial Rule 12(B)(2). Where, as here, the trial court rules on personal jurisdiction based on a paper record and argument from counsel, our review is de novo. *See Munster v. Groce*, 829 N.E.2d 52, 57 (Ind. Ct. App. 2005).

When a defendant challenges the existence of personal jurisdiction, the plaintiff must present evidence of the trial court's personal jurisdiction over the defendant. *Aquatherm GmbH v. Renaissance Assocs. I Ltd. P'ship*, 140 N.E.3d 349,

---

[4] Michele asks us to dismiss the appeal as to the Trusts because they filed their notice of joinder in PTI Union's motion to accept jurisdiction over interlocutory appeal one day late. In her opposition to the motion to accept jurisdiction and various joinders, Michele pointed out that the Trusts filed their joinder one day late. Still, our motions panel accepted jurisdiction as to all appellants. We decline to disturb that ruling.

[5] In her complaint, Michele alleged "Conspiracy/Concert of all Defendants." Appellants' App. Vol. III p. 90. Although the trial court denied PTI Union's motion to dismiss for lack of personal jurisdiction, it granted PTI Union's motion to dismiss Michele's civil conspiracy claim. Michele cross-appeals that issue. But because we find that there is no personal jurisdiction, we need not address Michele's cross-appeal.

357 (Ind. Ct. App. 2020). "The defendant, however, bears the ultimate burden of proving lack of personal jurisdiction by a preponderance of the evidence, unless such lack is apparent on the face of the complaint." *Id.* (quotation and footnote omitted).

[18] "Indiana Trial Rule 4.4(A) is Indiana's equivalent of a 'long-arm statute.'" *Id.* It enumerates eight acts that may serve as a basis for an Indiana trial court's assertion of personal jurisdiction over a nonresident and further provides that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." *Id.* As our Supreme Court has explained, this catchall language "was intended to, and does, reduce analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause." *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006).

[19] "The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). A state court may exercise personal jurisdiction over an out-of-state defendant who has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quotation omitted). There are two kinds of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co.,* 592 U.S. at 358.

# I. General Jurisdiction

We first quickly dispose of general jurisdiction. "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017). "General jurisdiction, as its name implies, extends to any and all claims brought against a defendant." *Ford Motor Co.*, 592 U.S. at 358 (quotation omitted). As the United States Supreme Court has explained:

> Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select set of affiliations with a forum will expose a defendant to such sweeping jurisdiction. In what we have called the paradigm case, **an individual is subject to general jurisdiction in her place of domicile. And the equivalent forums for a corporation are its place of incorporation and principal place of business.**

*Id.* at 358-59 (quotations and citations omitted, emphasis added).

Here, the Appellants are neither incorporated in Indiana nor have their principal places of business here. There is thus no general jurisdiction. *See Spokane Kart Racing Ass'n v. Am. Kart Track Promoters Ass'n*, 206 N.E.3d 462, 467 (Ind. Ct. App. 2023) (finding companies that were incorporated and had their principal places of business in Washington and Oregon were not "at home" in Indiana and thus there was no general jurisdiction), *trans. denied*.

## II. Specific Jurisdiction

Specific jurisdiction is not as straightforward. "Since *International Shoe,* specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction [has played] a reduced role." *Daimler AG v. Bauman*, 571 U.S. 117, 128 (2014) (quotation omitted). Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co.*, 592 U.S. at 359. "The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The United States Supreme Court has articulated several markers for "purposeful availment":

> The defendant, we have said, must take some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State. **The contacts must be the defendant's own choice** and not random, isolated, or fortuitous. **They must show that the defendant deliberately reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there.** Yet even then—because the defendant is not "at home"—the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims, we have often stated, must arise out of or relate to the defendant's contacts with the forum.

*Id.* (quotations and citations omitted, emphases added).

### A. PTI Union

We first address specific jurisdiction as to PTI Union, the primary appellant here. PTI Union argues that it did not purposefully avail itself of the privilege of

conducting business in Indiana. It claims that its involvement in the production of Caldesene was limited to blending and bottling the product in Missouri according to Insight's specifications and that it played no role in deciding where Caldesene would be shipped, as those decisions were made exclusively by Insight. It highlights Brasher's affidavit, in which he averred that "Insight owned and controlled the Caldesene product at the time Caldesene was picked up from the loading docks in Missouri by the Insight-designated carrier." Citing *Sebring v. Air Equipment & Engineering, Inc.*, 988 N.E.2d 272 (Ind. Ct. App. 2013), which it claims is "both factually square and controlling," PTI Union argues that the fact that the Caldesene made its way to Indiana through the stream of commerce is not enough to establish specific jurisdiction absent evidence that it did "something more" in Indiana. PTI Union's Br. pp. 18, 20.

[24] In *Sebring*, Sebring filed a complaint in Allen Superior Court after several of his fingers were amputated due to the alleged malfunction of a dust collector he was using while working at OmniSource in Fort Wayne. Sebring sued Donaldson Company, Inc., a Delaware corporation that manufactured the dust collector in Kentucky, and NCI, a Texas corporation that manufactured a component (screw conveyor) for the dust collector in Texas. Donaldson had purchased the screw conveyor from NCI and instructed NCI to ship it to OmniSource in Fort Wayne (normally NCI would ship the screw conveyors to Donaldson, but this time Donaldson instructed NCI to ship the screw conveyor

to OmniSource to expedite delivery). "The purchase order indicated that the shipment would be 'F.O.B.[6] Cleburne, TX.'" *Sebring*, 988 N.E.2d at 276.

[25] NCI moved to dismiss for lack of personal jurisdiction. In support, NCI submitted an affidavit from its president alleging, among other things, that (1) it did not have employees or facilities in Indiana, (2) it had a national advertising program that may have been directed to Indiana between March 1991 and October 1993 (but not since then), (3) since January 2003, it had not had a sales representative or distribution network in Indiana, (4) Donaldson directed and arranged to ship the screw conveyor to Fort Wayne (including choosing the carrier and paying freight charges), and (5) NCI did not install or inspect the screw conveyor at OmniSource and never had any contact with OmniSource or Sebring.

[26] On appeal, Sebring conceded there was no general jurisdiction but argued there was specific jurisdiction. We held that NCI's contacts with Indiana were too attenuated to support specific jurisdiction as the manufacturing process of the screw conveyor took place entirely within Texas, the decision to ship the screw conveyor to Indiana "was made unilaterally by Donaldson," and "NCI played no role in the decision to ship the screw conveyor to Indiana and its involvement in the transaction was complete when it tendered the screw

---

[6] "F.O.B." stands for "free on board." *See Sebring*, 988 N.E.2d at 274 n.1.

conveyor to the carrier in Texas." *Id.* We noted that the purchase order stated that the shipment would be "F.O.B. Cleburne, TX" and that under the UCC, "F.O.B. the placement of shipment" "means that the seller must place the goods in the possession of the carrier at that place." *Id.* We explained that a defendant must do "something more" than place a product in the stream of commerce, and "mere knowledge that a product would end up in a particular state after being placed in the stream of commerce" is not enough. *Id.* at 280. Our "something more" analysis relied on Justice Breyer's concurring opinion in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011).

[27]     In *J. McIntyre*, Nicastro, who worked in New Jersey, injured his hand while using a machine manufactured by a British company, J. McIntyre Machinery. He later filed a products-liability case against J. McIntyre in New Jersey. The New Jersey Supreme Court found that personal jurisdiction existed based on three primary facts: (1) J. McIntyre's American distributor sold and shipped a machine to Nicastro's employer around four times; (2) J. McIntyre permitted and desired that its American distributor sell its machines to anyone in the United States willing to buy them; and (3) representatives of J. McIntyre attended trade shows in such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco (but not in New Jersey). The New Jersey Supreme Court held that its courts can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer "knows or reasonably should know that its products are distributed through a nationwide

distribution system that might lead to those products being sold in any of the fifty states." *Id.* at 877 (quotation omitted).

[28] A plurality of the United States Supreme Court disagreed and found that New Jersey did not have personal jurisdiction because "[a]t no time did [J. McIntyre] engage in any activities in New Jersey that reveal an intent to invoke or benefit from the protection of its laws." *Id.* at 887. It noted that, "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* at 882.

[29] Justice Breyer, joined by another justice, concurred in the judgment, and—as quoted by us in *Sebring*—stated:

> [T]here is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users.

*Id.* at 889 (Breyer, J., concurring) (quotation omitted).

[30] We agree with PTI Union that *Sebring* controls here. In *Sebring*, NCI manufactured screw conveyors in Texas. Donaldson purchased a screw conveyor from NCI and directed NCI to ship it to OmniSource in Fort Wayne.

NCI did not control where the product went; instead, Donaldson selected a carrier and paid the freight charges. Here, PTI Union manufactured Caldesene for Insight in Missouri. Insight selected a carrier, paid the freight charges, and determined where the product would be shipped. As in *Sebring*, we conclude that PTI did not do "something more" than place the Caldesene in the stream of commerce.

[31]     Michele, however, claims that PTI Union "did 'something more' than place Caldesene into the stream of commerce." Appellee's Br. p. 28.[7] She relies on two things. *See* Oral Arg. at 53:29. First, she claims that PTI Union—not Insight—was responsible for transporting Caldesene and that it "coordinated shipments of Caldesene directly to Indiana" and "scheduled the pick-up times with the third-party carriers[.]" Appellee's Br. p. 28. Michele cites the Quality Agreement, which provides, "[PTI Union] shall transport manufactured Products under the appropriate environmental conditions." Appellants' App. Vol. VI p. 19. But the very next sentence provides that PTI Union "will follow the INSIGHT Release of Shipment Procedures as described in Annex 6." *Id.* As PTI Union notes, Annex 6 establishes that Insight was responsible for shipping and transportation. In addition, PTI Union acknowledges that it scheduled pick-up times with third-party carriers for practical reasons since it had access to

___

[7] Michele argues that the fact that "over 200,000 bottles of [Caldesene] were delivered from PTI's facility directly to Plainfield, Indiana over a period of years," by itself, establishes specific jurisdiction. Appellee's Br. p. 25. Michele, however, cites no authority that sales records alone are enough to establish specific jurisdiction.

its own dock. Even so, it asserts that this doesn't mean it had control over the product. Rather, Insight selected the carrier, paid the freight charges, and determined where the product was going. This does not establish "something more."

[32] Second, Michele claims that PTI Union had duties and responsibilities after the product left its dock, which establishes "something more." In support, Michele cites Annex 3 to the Quality Agreement. *See id.* at 24. This annex, called "Duties and Responsibilities," is a chart that indicates whether Insight, PTI Union, or both had certain duties and responsibilities under the contract. Michele points out that PTI Union was responsible for investigating, tracking, and taking corrective actions in response to consumer complaints, which would "necessarily include customer complaints originating from Indiana." Appellee's Br. p. 28. Here is the section of the chart that governs "Consumer Complaints/Adverse Events":

| FUNCTION | | INSIGHT | SUPPLIER |
|---|---|---|---|
| Consumer Complaints / Adverse Events | | | |
| Receipt of Complaint | | X | X |
| Notification to Manufacturer | | X | |
| Complaint Investigation ( Technical / Quality) | | | X |
| Compliant Investigation (Medical) | | X | |
| Response to Consumer / Patient | | X | |
| Trending and Tracking | | X | X |
| Corrective Actions | | | X |

Appellants' App. Vol. VI p. 27.

[33]     PTI Union acknowledges this chart but directs us to Article 12 of the Quality Agreement, which provides:

> 1. **As between the Parties, INSIGHT will communicate with the customer(s) and close all complaints related to the Products.** Each party shall, and shall require that its affiliates (i) adhere to all applicable legal requirements which relate[] to the reporting and investigation of AE's, as applicable, and (ii) keep the other Party informed of such experiences. INSIGHT shall have sole and exclusive responsibility for worldwide regulatory reporting of all AE's for the Products. Without limiting the foregoing, [PTI UNION] will forward any complaint information received by [it] to INSIGHT in no more than two (2) Business Day from [its] receipt.
>
> 2. Further, if a more urgent need is recognized, such as cases involving potential tampering or an AE involving death and/or serious injury, the party receiving such communication will immediately notify the other party. [PTI UNION] and INSIGHT will work together to address such issue expeditiously.
>
> 3. INSIGHT will immediately notify [PTI UNION] of cases that involve a technical or quality related issue and request [PTI UNION] to investigate and provide a written report within twenty (20) Business Days.

*Id.* at 19-20 (emphasis added). PTI Union says that Article 12 makes clear that Insight—not PTI Union—communicates with customers. As PTI Union explained at oral argument, because Insight's name is on the Caldesene bottles, Insight generally receives any complaints. *See* Oral Arg. at 13:09. According to paragraph 3 above, if the complaint concerns a technical or quality-related issue, Insight contacts PTI Union. PTI Union then investigates the complaint,

such as checking batch records that are stored on site in Missouri. The fact that PTI Union conducts investigations in Missouri does not establish that it does "something more" in Indiana.

[34] Michele also relies on *Aquatherm*. There, Renaissance sued Aquatherm, a German company that manufactured water pipes, in Indiana after water pipes that were installed in two apartment buildings failed. Aquatherm moved to dismiss the complaint for lack of personal jurisdiction. It argued that there was no specific jurisdiction because it "did nothing more than place its product into the stream of commerce, which is not enough[.]" *Aquatherm*, 140 N.E.3d at 354. The trial court found that specific jurisdiction existed and denied the motion to dismiss.

[35] On appeal, Aquatherm relied heavily on *Sebring*, which we found distinguishable:

> [U]nlike in *Sebring*, [Aquatherm] did not manufacture a component that was used in some other final product whose manufacturer shipped it elsewhere. Rather, [Aquatherm] delivered its completed product in the stream of commerce with the expectation that it would be purchased in various states, including Indiana. Its website linked interested United States users to www.aquatherm.com, which advertised a presence in the United States and specifically identified an Indianapolis company currently using its pipes, the Lifeline Data Center. The site also discussed [Aquatherm], its history, growth, products, current projects using the pipe and different applications, and the ten-year warranty that [Aquatherm] provided.

*Id.* at 360-61. We placed significant weight on Aquatherm's warranty, which "necessitated [its] continued involvement with the end-user of its product." *Id.* at 362. We concluded that "[Aquatherm's] activities, including its online presence and warranty, reflect that it expected or encouraged contacts with Indiana and that it has sufficient contacts with Indiana to support specific personal jurisdiction." *Id.* We therefore affirmed the trial court.

We find *Aquatherm* is distinguishable. There, we found important that Aquatherm had an interactive website, which identified a company in Indiana using its product, and a warranty, which necessitated its continued involvement with the customer. Neither is present here. *Aquatherm* doesn't control; *Sebring* does. Because PTI Union did not purposely avail itself of the privilege of conducting business in Indiana, the trial court erred in denying its motion to dismiss for lack of personal jurisdiction.[8]

## B. Black Creek

Our discussion above applies equally to Black Creek. In 2005, Black Creek, PTI Union's predecessor, manufactured 125,000 bottles of Caldesene in Missouri for Insight, which were then shipped to Plainfield. Black Creek argues, like PTI

---

[8] In its reply brief, PTI Union highlights that trial courts in Connecticut and Illinois have recently dismissed it from talcum-powder lawsuits based on the lack of specific jurisdiction. *See Phelan v. Arkema Inc.*, FBTCV236124450S, 2024 WL 3948951, at *8 (Conn. Super. Ct. Aug. 20, 2024) (noting, among other things, that "all of the respective product owners controlled and directed the shipment of these products" and PTI Union "did not control said products once bottled as they were designated 'free on board' at said facility"); *Epstein v. Albertson Cos.*, Case No. 23L10467, slip op. at 9 (Ill. Cir. Ct. Oct. 11, 2024) (noting, among other things, that PTI Union "had no role in determining the release or distribution of its product").

Union, that this doesn't establish specific jurisdiction because Insight directed and controlled where the Caldesene bottles were shipped. Black Creek directs us to a 2005 Purchase Order between it and Insight. According to this Purchase Order, Black Creek transferred the Caldesene bottles to Insight "FOB: Dock" at its Missouri docks. Appellants' App. Vol. VI p. 110. Black Creek claims that the delivery was complete once the Insight-selected carrier picked up the product from its docks and therefore it didn't do "something more" than just place Insight's product into the stream of commerce in Missouri. For the same reasons as above, we find that Black Creek did not purposely avail itself of the privilege of conducting business in Indiana. The trial court therefore erred in denying its motion to dismiss for lack of personal jurisdiction.

## C. Broadview and the Trusts

[38]     Because we find that there is no personal jurisdiction over PTI Union, there is necessarily no personal jurisdiction over Broadview (the holding company of PTI Union) and the Trusts (the members of Broadview). Accordingly, the trial court erred in denying their motions to dismiss for lack of personal jurisdiction.[9]

---

[9] Michele argues that "even if this court does not believe the evidence already before the trial court was sufficient to outright deny Appellants' motions," then we should send this case back to the trial court for more discovery rather than reversing. Appellee's Br. pp. 31-32. She notes that the deposition of Brasher was suspended and discovery was stayed when the trial court removed the case's "exigent status." *Id.* at 31. But as PTI Union highlights, in her response to the motions to dismiss, Michele made no claim that she needed to resume Brasher's deposition before she could file her response. *See* Appellants' App. Vol. IV pp. 17-27. At oral argument, Michele's attorney conceded that she did not ask the trial court to stay the motion-to-dismiss proceedings so that additional discovery could be conducted. Oral Arg. at 41:49. If Michele believed she

[39] We therefore remand this case with instructions for the trial court to grant Appellants' motions to dismiss for lack of personal jurisdiction.

[40] Reversed and remanded.

Altice, C.J., and Scheele, J., concur.

ATTORNEYS FOR APPELLANT PTI UNION, LLC

Jeffrey B. Fecht
Riley Bennett Egloff LLP
Indianapolis, Indiana

Knight S. Anderson
Michael J. Ruttinger
Tucker Ellis LLP
Cleveland, Ohio

ATTORNEYS FOR APPELLANT BLACK CREEK CORPORATION

Christopher D. Lee
Daniel R. Kelley
Alex W. Layton
Dinsmore & Shohl LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT BROADVIEW INVESTMENTS, LLC

Jeffrey B. Fecht
Riley Bennett Egloff LLP
Indianapolis, Indiana

Knight S. Anderson
Tucker Ellis LLP
Cleveland, Ohio

---

could not fully and fairly respond to PTI Union's motion to dismiss, the time to speak up was **before** the trial court ruled—not after.

ATTORNEYS FOR APPELLANTS EDWARD T. NOLAND, JR., IRREVOCABLE GIFTING TRUST, TARRASCH FAMILY TRUST, REVOCABLE LIVING TRUST OF EDWARD T. NOLAND, JR., AND LAURA NOLAND TARRASCH REVOCABLE TRUST

Christopher N. Wahl
David J. Saferight
Steffey Wahl, LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Kathleen A. Farinas
Todd Barnes
Sarah Broderick
DOBS & Farinas, LLP
Indianapolis Indiana